NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

No. 21-1094

———————————

JOSEPH NADEL,
Appellant

v.

UNITED STATES OF AMERICA

———————————

Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action No. 1-19-cv-01099)
Circuit Judge: Honorable Stephanos Bibas[*]

———————————

Submitted under Third Circuit LAR 34.1(a)
On November 19, 2021

Before: AMBRO, JORDAN and ROTH, Circuit Judges

(Opinion filed: February 9, 2022)

———————————

OPINION[**]

———————————

_____

[*] The Honorable Stephanos Bibas, United States Circuit Judge of the United States Court of Appeals for the Third Circuit, sitting by designation pursuant to 28 U.S.C. § 291(b).

[**] This disposition is not an opinion of the full Court and for I.O.P. 5.7 does not constitute binding precedent.

ROTH, <u>Circuit Judge</u>

Joseph Nadel sued the United States for negligence, claiming he was injured during a medical procedure at a veterans' hospital. Delaware law, which applies in this action under the Federal Tort Claims Act,[1] requires the plaintiff in a medical malpractice suit to produce credible expert testimony specifying how the defendant deviated from the applicable standard of care. Nadel's expert opined that the staff at the veterans' hospital misused a medical device. However, the expert based his opinion on a misunderstanding of another witness' testimony. Accordingly, the District Court granted summary judgment to the United States. We will affirm.

I.

Nadel went to a hospital operated by the United States Department of Veterans Affairs to undergo an esophagogastroduodenoscopy. During the procedure, a doctor found two areas of angioectasia, malformed blood vessels, in Nadel's duodenum. The doctor cauterized the areas of angioectasia with an instrument called a Gold Probe, manufactured by Boston Scientific. The Gold Probe was powered by an electrosurgery machine, manufactured by Erbe. After the surgery, staff at the veterans' hospital discovered that Nadel's duodenum was perforated. The veterans' hospital transferred Nadel to another hospital, where doctors performed emergency surgery to patch his duodenum and remove his gallbladder.

---

[1] 28 U.S.C. §§ 1346, 2671–2680.

Nadel sued the United States under the Federal Tort Claims Act. He claims the staff at the veterans' hospital used the wrong settings on the Erbe machine, which caused it to power the Gold Probe with too much voltage, and in turn caused the Gold Probe to perforate Nadel's duodenum.

Nadel's sole expert witness was Dr. Todd D. Eisner, who authored two reports. Each report was one-page long. In his first report, Eisner said the Erbe machine produces 550V when the machine is on its "forced coag" setting, as the surgical progress notes indicate that it was during Nadel's procedure.[2] Eisner also said, "[a]ccording to Boston Scientific, the maximum voltage for the Gold Probe is 350V."[3] Eisner opined that because the voltage produced by the Erbe machine, when set to forced coag, exceeds the maximum voltage of the Gold Probe, the staff at the veterans' hospital breached the standard of care by setting the Erbe machine to forced coag while using the Gold Probe and that this breach caused the perforation of Nadel's duodenum.

Eisner prepared a second report after reviewing the deposition transcript of John Day, a vice president at Erbe, USA. Eisner's second report differs from his first report in three important ways. First, Eisner said that the maximum voltage for the Gold Probe is 250V—not 350V as he said in his first report. Second, Eisner said that the Erbe machine was probably not used on the forced coag setting. Indeed, Eisner acknowledged that "Mr. Day testified that he is 'not sure it[ is] even possible to use "forced coag" with a

---

[2] J.A. at 44.
[3] Id.

3

Gold Probe.'"[4] Third, Eisner said that the Erbe machine produced 460V during the procedure, not 550V as he said in his first report. Eisner opined that the staff at the veterans' hospital breached the standard of care by using the Erbe machine at a setting that powered the Gold Probe with 460V, exceeding the Gold Probe's maximum voltage of 250V.

In his second report, Eisner makes clear that his understanding of the voltage produced by the Erbe machine was based entirely on an email from Day and Day's deposition testimony. In Eisner's deposition, he confirmed that he had no basis, other than Day's email and testimony, for his belief that the Erbe machine produced 460V during Nadel's procedure.

Contrary to Eisner's understanding, Day did not testify or write in the email that the Erbe machine produced 460V during Nadel's procedure. Instead, Day testified and wrote that, at a certain setting, the Erbe machine produces 460V when tested into a 200-ohm load resistor. Yet, as Day explained, the voltage produced by the Erbe machine varies based on the resistance it meets. Day testified he does not know the resistance of the human duodenum, whether it is 200 ohms or something else, so he cannot know, without further testing, the voltage actually produced by the Erbe machine during Nadel's procedure.

The United States moved for summary judgment. The District Court granted it. Nadel appealed.

---

[4] *Id*. at 73.

II.

The District Court had jurisdiction under 28 U.S.C. § 1346(b). We have appellate jurisdiction under 28 U.S.C. § 1291.

"We review the District Court's grant of summary judgment de novo."[5] Summary judgment is appropriate when a party shows "there is no genuine dispute as to any material fact" and it "is entitled to judgment as a matter of law."[6] We view all facts "in the light most favorable to the non-moving party" and draw "all reasonable inferences . . . in that party's favor."[7]

III.

Under the Federal Tort Claims Act, the United States is liable for the negligence of its employees when they are acting within the scope of their employment.[8] Liability is based on the law of the state where the alleged negligence occurred.[9] Thus, Delaware law applies in this action.

Delaware law requires a party alleging medical malpractice to "produce expert medical testimony that specifies (1) the applicable standard of care, (2) the alleged deviation from that standard, and (3) the causal link between the deviation and the alleged injury."[10] A plaintiff is "not required to provide uncontradicted evidence of the

---

[5] *Sapa Extrusions, Inc. v. Liberty Mut. Ins. Co.*, 939 F.3d 243, 249 (3d Cir. 2019).
[6] FED. R. CIV. P. 56(a).
[7] *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (internal quotation marks omitted).
[8] 28 U.S.C. § 1346(b)(1).
[9] *See Molzof v. United States*, 502 U.S. 301, 305 (1992) ("[T]he extent of the United States' liability under the FTCA is generally determined by reference to state law.").
[10] *Green v. Weiner*, 766 A.2d 492, 494–95 (Del. 2001) (citing 18 Del. C. § 6853).

elements of [his] negligence claim," but the plaintiff must "provide credible evidence of each of these elements from which a reasonable jury could find in [his] favor."[11]

Here, the District Court correctly concluded Eisner did not provide credible evidence of a deviation from the standard of care. Eisner's opinion rests on the premise that the Erbe machine produced 460V during Nadel's procedure—exceeding the Gold Probe's maximum voltage of 250V. Yet Eisner conceded his only basis for concluding the Erbe machine produced 460V during Nadel's actual procedure was Day's testimony and email. Because Day did not testify or write in the email that the Erbe machine produced 460V during Nadel's actual procedure but merely spoke of the general capacity of the Erbe machine, Eisner's opinion does not meet the required standard.

Nadel argues the District Court impermissibly weighed evidence at the summary judgment stage and, in doing so, improperly concluded Eisner's opinion was speculative. To be sure, any contention that an expert is speculating goes "to the weight of the evidence and thus presents a jury question."[12] However, here, the District Court neither weighed evidence nor concluded Eisner's opinion was speculative. Instead, the District Court focused on the inquiry mandated by Delaware law: Determining whether Eisner's opinion met the standard required by Delaware law. As explained, Eisner's opinion did not meet that standard because it was based on a misunderstanding of Day's email and

---

[11] *Id.* at 495.
[12] *Id.* at 496.

testimony. A reasonable jury could not find in Nadel's favor, so summary judgment was appropriate.[13]

IV.

Because Nadel failed to provide the required expert evidence of a deviation from the standard of care, summary judgment in favor of the United States was appropriate. We will affirm the judgment of the District Court.

---

[13] Separately, Nadel contends the District Court held him to the practically impossible burden of proving the resistance of *his* duodenum. Not true. There were many ways Nadel could have chosen to support his claim. Nadel could not, however, support his claim by relying on expert evidence that is not credible. Thus, Eisner's misunderstanding of Day's email and testimony is fatal to Nadel's claim.